Filed 6/25/25  L.T. v. B.P. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| L.T.,<br><br>        Plaintiff and<br>        Respondent,<br><br>v.<br><br>B.P.,<br><br>        Defendant and<br>        Appellant. | A170977<br><br>(San Mateo County<br>Super. Ct. No. 24-FAM-00157) |

B.P. appeals from a domestic violence restraining order (DVRO) under the Domestic Violence Prevention Act (DVPA; Fam. Code,[1] § 6200 et seq.) prohibiting him from contacting or abusing his separated wife L.T., their children, and L.T.'s mother. He concedes that substantial evidence supports the trial court's findings but contends those findings do not justify the issuance of a three-year DVRO.  We find no error and affirm.

### BACKGROUND

Because B.P. does not challenge the evidentiary basis for the court's findings or the credibility determinations on which the

---

[1] Undesignated statutory citations are to the Family Code.

1

trial court based its findings, we need not describe the conflicting testimony in detail here.  It suffices to summarize the incidents that the court cited as justifying the DVRO.

L.T. met B.P. in July 2015.  B.P. told her that he had a mental health condition and was taking anti-psychotic medication.  In March 2017, after his doctor took him off his medication, B.P. experienced psychosis again.  One of B.P.'s symptoms was a belief that L.T. was a Russian spy.  To see whether she was a spy, B.P. pressed on the site of an old injury in L.T.'s neck to see if he could get it to hurt.  L.T. told him he was hurting her.  B.P. said he did not believe her and left.  He was hospitalized and resumed taking his medication.

B.P. and L.T. married in May 2017.  They have two children, N.P. and E.P.  After N.P. was born in September 2020, B.P. began directing tirades of extreme aggression and uncontrollable outbursts at L.T.  These episodes would last for hours.  B.P. frequently called L.T. "fucking bitch" and "selfish bitch," as well as, less frequently, "lying bitch," "whore," and "cunt."  The children were usually present during B.P.'s rants when he would call L.T. these names.  B.P. claimed the children did not react, but L.T. testified that N.P. would cry hysterically.

B.P. engaged in the same tirades towards L.T.'s mother.  In July 2023, B.P. and L.T. went to visit L.T.'s mother, whose husband had died.  B.P. told L.T's mother that he was glad her husband had died and that her husband deserved what he got.  B.P. also called L.T.'s mother a bitch and a hag and said he would be glad if she was gone.  L.T. said the children would cry when he

did this.  B.P. admitted that he told L.T.'s mother that he hated her in front of the children, but he claimed the children did not react, just like when he would call L.T. names.

On New Year's Eve in 2023, L.T. and her mother bought a confetti popper at Walmart to celebrate.  N.P. and E.P. stayed by the front porch while L.T. went out in the front yard.  L.T. twisted the popper and it threw out confetti.  B.P. rushed up and took N.P. away, telling L.T. she was endangering N.P. with a bomb.  B.P. accused L.T. that same evening of indoctrinating N.P. into drinking culture by letting him toast with sparkling water.  L.T. believed B.P. was slipping into an alternate reality, like he had during his psychotic episode in 2017.  She was afraid that anything she might do or say would set him off on a rant.  She was also afraid for her safety and that of the children if B.P. were to hallucinate that L.T. intended to harm him or the children.

In January 2024, L.T. asked B.P. to make a smoothie with bananas and kiwis for three-year-old N.P.  B.P. said they did not have any kiwis, but L.T. said they did.  B.P. told N.P., "Mommy's lying to you," and, "Mommy's trying to manipulate you."  N.P. insisted on checking the fridge and showed B.P. kiwis in the fridge.  B.P. told N.P. the kiwis were rotten and yucky and said, "Mommy's trying to make you sick."  N.P. screamed at B.P. that the kiwis were not rotten and showed him they were still good.  L.T. came and told B.P. he could use the kiwis, which were still good and were where L.T. had said they were.  B.P. then went off on a two-hour rant, accusing L.T. of trying to manipulate him and calling her a "whore," a "lying bitch," and a "manipulative

bitch." B.P. told N.P., "[I] can't wait for us to be rid of mommy so she isn't in our lives any more, and she can't do this to us any more." He also said that he was going to buy a place at Lake Tahoe for just him and N.P., where they could spend time together alone.

L.T. was particularly concerned about B.P.'s inappropriate attachment to and interactions with N.P. During a September 2023 video call with B.P. and N.P. while L.T. was away on a trip, N.P. was naked from the waist down as part of a toilet training regimen. During the 20-minute call, N.P. pushed his genitals against B.P.'s face and mouth about one hundred times, while both he and B.P. laughed. L.T. was concerned because B.P. did not stop the behavior and just sat there laughing and grinning. L.T. was not alleging in the DVRO proceedings that B.P. sexually abused N.P. or E.P. because she had no proof, but she nonetheless was afraid for N.P.'s safety after the call.

L.T. was also concerned about other ways in which B.P. interacted with N.P. more intimately and intensively than she believed a father should. B.P. would lie on top of N.P. in N.P.'s bed to brush N.P.'s teeth. B.P. would spoon N.P. in bed for hours until L.T. woke up B.P. and told him to sleep in a separate bed. And just before L.T. filed her petition for a restraining order, B.P. had started holding N.P. on his lap during dinner and kissing him up and down the sides of his neck. To L.T., it looked very intimate, the way someone would kiss a partner, and B.P. refused to stop when she asked.

4

In January 2024, L.T. filed a request for a DVRO protecting herself, the children, and her mother from B.P. She filed for divorce at the same time. The trial court granted a temporary restraining order the next day. B.P. filed his own request for a DVRO against L.T. in March 2024. B.P. alleged that L.T. engaged in aggressive and degrading verbal and emotional abuse of him in the presence of the children. He claimed that L.T. had called him a " 'fucking asshole,' " " 'piece of shit,' " " 'worthless,' " and " 'psychotic.' " He also alleged that she told the children their marital problems were because B.P. was mentally ill.

The court heard testimony on four different dates in March and May 2024. L.T. asked the court to make the temporary restraining order permanent because of her experiences over the course of eight years of increasing hostility and volatility from B.P. and his hallucinations. She believed B.P was teetering on the edge of reality, and she feared for her safety and that of her children. She provided copies of text messages with B.P.'s mother in which L.T. raised her concerns about B.P.'s behavior, including B.P.'s treatment of L.T.'s mother, but B.P.'s mother did not meaningfully respond to L.T.'s concerns.

B.P. and L.T. both testified at the hearings, as did L.T.'s mother, B.P.'s mother, B.P.'s psychiatrist, and B.P.'s supervisor at the law firm where he was a partner. Regarding B.P.'s petition, B.P. testified that L.T. called him names frequently, perhaps daily. B.P. provided chat and text records in which she called him and other people names. L.T. acknowledged calling B.P. names in the chats and texts. She explained that during

B.P.'s tirades, he would interrupt and talk over her, so she would retreat to texts and chats where she could be braver. She testified that she did not call him names in front of the children.

The trial court granted L.T.'s request and denied B.P.'s. The court found L.T.'s mother to be credible, particularly about B.P.'s comments after her husband died. The court also credited L.T.'s testimony about the same event, which the court found would disturb L.T.'s peace.

The court found B.P.'s mother was biased in favor of B.P. and was advocating for him during the proceedings.

The court found B.P.'s testimony to be evasive and not credible overall. The court said it was curious that B.P. would claim the children had no reaction when B.P. told L.T. that he hated her. The court noted that California public policy recognizes that conflict between parents in front of children impacts the children.

L.T. was credible in the court's opinion, especially about the New Year's Eve confetti popper and sparkling water incidents and the smoothie incident. B.P.'s behavior during those incidents disturbed L.T.'s peace, was abusive, and caused her fear. L.T. also credibly described earlier abuse in the Russian spy incident, where B.P. pushed on L.T.'s neck to cause her pain. The court credited L.T.'s testimony about the video call in which N.P. pushed his genitals into B.P.'s face and found B.P.'s behavior disturbed L.T.'s peace. The court also found B.P. disturbed L.T.'s peace when he lay down on top of N.P. to brush his teeth and kissed N.P.'s neck in inappropriate ways.

The court disregarded as irrelevant the testimony of B.P.'s psychiatrist and work supervisor.

Regarding B.P.'s DVRO request, the court found credible L.T.'s explanation that she only used foul language over text communications. The court found there was not a preponderance of the evidence that L.T. disturbed B.P.'s peace. But to the extent that she did, the court found the parties' separation enabled B.P. to seek resolution of the causes of the abuse. The trial court therefore granted L.T.'s request for a restraining order but reduced the length of the order from five years to three. The restraining order, among other things, awarded L.T. sole custody of the children and required B.P. to complete a batterer intervention program.

## DISCUSSION

"Under the DVPA, a court is authorized to issue a protective order ' " 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " ' [Citations.] Abuse includes 'intentionally or recklessly caus[ing] or attempt[ing] to cause bodily injury'; '[s]exual assault'; 'plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another'; and 'engag[ing] in any behavior that has been or could be enjoined' under section 6320. (§ 6203, subd. (a).) Behavior that may be enjoined under section 6320 relevant to this appeal includes 'disturbing the peace of the other party' (§ 6320, subd. (a)), which 'may be properly understood as conduct

7

that destroys [another's] mental or emotional calm.' [Citation.] 'Thus, section 6320 provides that "the requisite abuse need not be actual infliction of physical injury or assault." ' [Citation.]

"The DVPA vests the court with discretion to issue a restraining order 'simply on the basis of an affidavit showing past abuse.' [Citation.] The burden of proof is by a preponderance of the evidence. [Citations.] The DVPA 'confer[s] a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally.' [Citation.]

"We review the grant of a DVPA restraining order for abuse of discretion, and, to the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review. [Citation.] In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings. [Citation.] We must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment. [Citation.] We do not determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding." (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11–12.) "An abuse of discretion occurs when the ruling exceeds the bounds of reason." (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

B.P. recognizes that the trial court's factual findings are based on its credibility determinations, which are subject to

8

extremely deferential review. He therefore accepts the trial court's factual findings and argues mostly that those findings do not support the trial court's order.[2] B.P. characterizes most of the incidents and behaviors the trial court highlighted as mere marital disagreements or differences in parenting styles and contends that the trial court abused its discretion in issuing the DVRO based on them. We are not convinced.

The trial court found that B.P. committed abuse in the Russian spy incident when he pushed on L.T.'s neck to intentionally cause her pain, to determine whether she might be a Russian spy. B.P. concedes that this incident would qualify as abuse had it occurred recently, but he points out that it occurred in 2017, before the parties' marriage and seven years before the DVRO proceeding.

In his opening brief, B.P. argued that section 3044, subdivision (a) limits allegations of physical abuse to five years.

---

[2] Despite generally arguing that the trial court abused its discretion, B.P. suggests at one point that the trial court committed legal error by issuing the DVRO based on non-abusive behavior. He cites *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 117, which held that a trial court's "categorical refusal to consider postfiling evidence . . . was legal error and therefore constituted an abuse of the court's discretion." The trial court here did not refuse to consider any evidence, so this principle does not apply. B.P. also quotes from *Eneaji v. Ubboe*, *supra*, 229 Cal.App.4th at page 1463 the familiar principle that the question of whether a trial court understood the correct legal standard and applied the proper criteria and legal assumptions is subject to de novo review. B.P. does not argue that the trial court erred in its statement of the legal standard and criteria, only that it incorrectly concluded that the facts met the legal standard of abuse.

This is incorrect.  Section 3044, subdivision (a) states only that there is a rebuttable presumption that it is detrimental to a child's best interest to award custody of the child to a party that has perpetrated domestic violence against the other person seeking custody within the previous five years.  (See also *id.*, subd. (c) [defining perpetration of domestic violence for these purposes as including causing bodily injury and disturbing a party's peace].)  This does not place a time limitation on acts of abuse that can support a DVRO.  To the contrary, as L.T. points out, section 6301, subdivision (d) states that "[t]he length of time since the most recent act of abuse is not, by itself, determinative" and a trial court must consider the totality of the circumstances when considering a request for a DVRO.  There is no bright line cutoff for how recent an act of abuse must be to support a DVRO.[3]

In his reply brief, B.P. pivots and argues instead that it cannot be the law that an isolated, premarital act of abuse seven years earlier, which is explainable as a result of B.P.'s psychiatrist tapering his anti-psychotic medication, can support a DVRO in the context of a marital dissolution.  But the incident relates to L.T.'s current fear for her safety and that of the children because B.P.'s more recent behavior made L.T. concerned that B.P. was again experiencing psychosis.  The trial

---

[3] When the trial court ruled, this requirement was in section 6301, subdivision (c).  (Former § 6301, subd. (c), as amended by Stats. 2015, ch. 303, § 150.)  The Legislature amended this statute effective January 1, 2025, and placed the principle in subdivision (d), without substantive change.  (See Stats. 2024, ch. 652, § 2.)

court's findings regarding B.P.'s behavior on New Year's Eve 2023, when he accused L.T. of having a bomb by using a store-bought confetti popper and placing the children at risk of alcoholism by serving them sparkling water, buttress its finding that L.T.'s fear was credible. So, too, does the smoothie incident, in which B.P. denied that kiwis existed or were suitable for a smoothie for N.P., and then launched into a lengthy tirade and accused L.T. of manipulating him and the children when three-year-old N.P. showed him the unspoiled kiwis and L.T. insisted that he could make a smoothie with them. Taken together, the totality of the circumstances surrounding these incidents supports the trial court's conclusion that L.T. was in fear for her safety and her children's safety based on her concern that B.P. was slipping into an alternate reality.

B.P. asserts that his medical or mental health issues were not the reason that L.T. sought a DVRO. Her counsel did say as much in her closing argument. But her counsel was also clear moments later that L.T. had genuine concerns about B.P.'s perceptions of reality that caused her fear about his behavior. In other words, the issue was not whether B.P. had been diagnosed with a mental health condition, but whether his recent behavior, however it might be characterized by a medical professional, was placing L.T. in fear.

The trial court's findings that B.P. disturbed L.T.'s peace also support the DVRO. "[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or

11

emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497.) L.T., whose testimony the trial court found credible, described B.P.'s record of increasingly frequent, hours-long tirades against L.T. These outbursts would last for hours and involved B.P. calling L.T. crude names, including "fucking bitch," "whore," and "cunt" in front of the children. N.P. would cry hysterically during B.P.'s rants. By any reasonable definition, such behavior destroyed L.T.'s emotional and mental calm.

B.P. compares this case to *Curcio v. Pels*, *supra*, 47 Cal.App.5th at page 13, which held a single private Facebook post could not support a DVRO. He also cites *K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 974, 981, which remarked that written comments in a court-mandated, online coparenting communication tool did not rise to the level of disturbing someone's peace. These comparisons are inapt. B.P.'s conduct was much more extensive than a few stray comments, and B.P. directed his behavior at L.T. and her mother in person and in front of the children.

B.P.'s comments to L.T. during the smoothie episode confirm this. B.P. dismisses the incident as a trivial dispute over whether a kiwi was spoiled. And it is true that, if the dispute over the kiwis was not indicative of B.P. possibly slipping into an alternate reality, it was a simple household quarrel. But that merely highlights why B.P.'s reaction was excessive and disproportionate. The trial court was within its discretion to conclude that B.P.'s two-hour tirade, complete with accusations of

12

manipulation and lying, profanity, and insults, based on a disagreement about a breakfast smoothie for a three-year-old child, was evidence of recent abuse in the form of disturbing L.T.'s peace.

The same is true of the evidence regarding L.T.'s mother. The trial court found both L.T. and her mother credibly testified that B.P. told L.T.'s mother that he was glad her husband died and that her husband got what he deserved. B.P. minimizes his comment as a one-off statement to a mother-in-law that he did not like. But he also called L.T.'s mother a "bitch" and a "hag," told her he hated her in front of the children, and said he would be glad if she was gone. The trial court apparently mistakenly believed that B.P. said he hated L.T. in front of the children. In actuality, he said he hated L.T.'s mother and insulted L.T. with names. But regardless of which person he directed each comment to, the trial court reasonably disbelieved B.P.'s additional testimony that the children did not react at all to hearing B.P.'s harsh remarks to L.T. and her mother.

B.P. notes that L.T. did not accuse of him of sexual abuse of N.P. and thus dismisses the trial court's finding about N.P.'s behavior in pushing his genitals on B.P.'s face during a video call. He also characterizes as a "parental choice" or "playful behavior" his other actions with N.P. that the trial court found disturbed L.T.'s peace, which were brushing N.P.'s teeth while lying on top of him and kissing N.P.'s neck inappropriately. Here, again, accepting the trial court's credibility determinations and factual findings regarding these incidents, the trial court was within its

13

discretion to find the incidents supported its order. The trial court observed the witnesses' demeanor and could assess their credibility in their differing descriptions of these incidents. It is conceivable that one parent could view the tooth brushing or neck kisses as benign differences in parenting styles. But another parent could view them as more than that and see B.P.'s refusal to desist from the behaviors as disturbing to the parent's peace. It was the trial court's role to weigh the different witnesses' credibility and determine which account was accurate, and B.P. offers no basis to overturn that determination. This is especially true of the video call. Even if it does not rise to the level of sexual abuse, the trial court reasonably found it to be inappropriate and disturbing to L.T.'s peace.

Moreover, even if any one of B.P.'s behaviors with N.P. or his actions with L.T. would not on its own justify issuance of a three-year DVRO in the context of a divorce, it would not matter. The trial court was required to look at the totality of the circumstances. Taking all of the incidents together, between the somewhat dated instance of physical abuse against L.T., more recent behavior raising genuine fears in L.T. about a recurrence of physical abuse, hours-long rants and inappropriate comments over trivial incidents, and B.P.'s unusual behaviors with N.P. and refusal to desist from them, we cannot say the trial court abused its discretion in issuing the DVRO.

Finally, B.P. contends the trial court abused its discretion in denying his request for a DVRO while granting L.T.'s. He points out that the trial court found that to the extent that L.T.'s

verbal abuse of B.P. in text communications disturbed B.P.'s peace, a DVRO was unnecessary because the parties' separation provided a period of calm sufficient to allow them to resolve the problem. He contends this was the correct ruling and then questions why the trial court did not treat L.T.'s DVRO petition the same way. The two parties' conduct was not equivalent. The trial court credited L.T.'s testimony that she only used foul language against B.P. in text communications in response to B.P.'s tirades. B.P.'s abuse of L.T. took place in person, and in front of their children. It was not absurd or irrational for the court to conclude that L.T. was entitled to judicial relief while B.P. was not.

## DISPOSITION

The trial court's order is affirmed.

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

15